POLLARD et al. v. REARDON.

REARDON v. POLLARD et al.

(Circuit Court of Appeals, First Circuit. January 18, 1895.)

Nos. 79 and 80.

1. EQUITABLE ESTOPPEL—TRANSFER OF BILL OF LADING PERMITTED BY MORT-GAGEE OF GOODS.

M., as security on the renewal of his note held by P., made and delivered to P. a bill of sale of certain hides to arrive from a foreign port. Afterwards, in consideration of the indorsement by R. of another note, the proceeds of which went to M., M. gave to R., who had no notice of the bill of sale to P., a memorandum of sale of the same hides, agreeing therein to deliver the bill of lading on receipt by him, and subsequently indorsed and delivered it to R. The note indorsed by R. was renewed when due, and the renewed note was protested, and paid by R. before the arrival of the hides. P. never demanded the bill of lading, but claimed the hides on their arrival. *Held*, that P. was estopped by presumed assent to the issue of the bill of lading to M., emphasized by laches in applying for it, and P.'s right could not prevail against R.'s title under the bill of lading.

2. NEGOTIABLE INSTRUMENTS—BILL OF LADING.

A bill of lading in the usual form is a negotiable instrument, even though not in the same sense as promissory notes or bills of exchange, and carries on its face, in the words "and assigns," authority to dispose of it, and like authority when indorsed in blank, by which the person who voluntarily puts it out or permits it to be put out is estopped, as against one who innocently advances value thereon, if one of the two must suffer.

3. SAME—BONA FIDE PURCHASERS—PRESENT CONSIDERATION—ADVANCES ON BILL OF LADING TO BE DELIVERED.

Advances made on the security of a memorandum of sale of goods to arrive, which contains a stipulation that the bill of lading shall be delivered when it arrives, constitute a present consideration for the transfer; the delivery of the bill of lading on its arrival, in connection with the prior stipulation, constituting in equity but one transaction.

4. EQUITY—JURISDICTION—RECOVERY OF POSSESSION OF GOODS IN CUSTODY OF COLLECTOR.

Imported goods, in the custody of the collector, being, under Rev. St. § 934, irrepleviable, although subject to the orders and decrees of the

courts of the United States having appropriate jurisdiction, a bill in equity may be maintained to obtain possession of them.

**5.** COSTS ON APPEAL—EFFECT OF REVERSAL ON RIGHTS OF PARTY NOT APPEAL-ING.

On a bill to obtain possession of goods in the custody of a collector, to which he is made a defendant, and properly makes a several defense, but, by reason of a stipulation between the parties in interest, takes no part in an appeal from a decree for complainants,. he is entitled, on reversal of the decree, to costs in the court below, but not to costs in the appellate court.

Appeals from the Circuit Court of the United States for the District of Massachusetts.

This was a suit by Reuben T. Pollard and others against Leverett Saltonstall, collector of the port of Boston, and Edmund Reardon, for the foreclosure of a chattel mortgage and an injunction. The circuit court rendered a decree for complainants. 56 Fed. 861. Defendant Reardon and complainants separately appealed from the decree.

In August, 1888, one N. B. Mansfield made a bill of sale to Pollard, Pettus & Co., of New York, of a quantity of hides then on the coast of Africa, and loaded, or about to be loaded, on a vessel for shipment to said Mansfield. The bill of sale was given as security for the renewal of a note of Mansfield's for $10,500, held by Pollard, Pettus & Co. In October, 1888, in consideration of the indorsement by one Edmund Reardon of a note for $8,000, Mansfield gave to Reardon a memorandum of sale of the hides, agreeing to deliver the bill of lading when received. In November, 1888, the bill of lading was received by Mansfield, and by him indorsed and delivered to Reardon. The note indorsed by Reardon was once renewed, and before the arrival of the hides the renewal note was protested, and paid by Reardon. On the 8th of April, 1889, the vessel carrying the hides arrived, and on the 16th of April a permit was issued to Reardon by the collector of customs to land the hides. April 17th, Pollard, Pettus & Co. demanded the hides from the collector, and immediately afterwards brought this suit to foreclose the chattel mortgage evidenced by their bill of sale, and to enjoin the delivery of the hides to Reardon. At the time of the institution of the suit there remained due on the note of Mansfield to Pollard, Pettus & Co. $3,334.30, but they claimed that the hides were conveyed to them as security also for a balance due to them from Mansfield on general account. The court found in their favor as to the balance due on the note only, and this they assigned as error.

Charles K. Cobb, for Pollard and others.

Lewis S. Dabney, for Reardon.

Before PUTNAM, Circuit Judge, and NELSON and WEBB, District Judges.

PUTNAM, Circuit Judge. The effect to be given to the negotiation of the bill of lading in this case does not seem to have been brought to the attention of the circuit court as it has been to ours. Bills of lading are not negotiable instruments in the full sense that promissory notes are, yet they are justly styled negotiable. Among the reasons for this are that they are well-recognized commercial instruments, that when indorsed in blank they carry title by mere delivery from hand to hand, and that the community gives credit in reliance on what appears on the face of them. Pollard v. Vinton, 105 U. S. 7, 8; Friedlander v. Railway Co., 130 U. S. 416, 424, 9 Sup. Ct. 570; Pease v. Gloahec, L. R. 1 P. C. 219, 227; 4 Daniel, Neg.

v.65f.no.8—54

Inst. (4th Ed.) § 1727. They have become by custom and necessity peculiarly subject to the rules stated by Lord Herschell in Bank v. Simmons [1892] App. Cas. 201, 215, as follows:

"The general rule of the law is that, where a person has obtained the property of another from one who is dealing with it without the authority of the true owner, no title is acquired as against that owner, even though full value be given, and the property be taken in the belief that an unquestionable title thereto is being obtained, unless the person taking it can show that the true owner has so acted as to mislead him into the belief that the person dealing with the property had authority to do so. If this can be shown, a good title is acquired by personal estoppel against the true owner."

The peculiar form and phraseology of ordinary bills of lading, and the generally known reliance placed upon them and credit given them in commercial communities, render the principles of these expressions especially applicable to them; and common honesty, in the light of modern business and financial methods, throws a special burden on those who put them out. It is true, as said by the supreme court in the cases cited, that they are as so much cotton, grain, or corn, and that, as no sale of such articles, when lost or stolen, can divest ownership, the same is true as to sales of their lost or stolen symbols. In mere cases of theft or loss this is a clear rule; yet when there is no theft or loss, but a voluntary intrusting to an agent or other person, though for a special purpose, with no notice on the face of a limited right, the fact is then to be considered that there is an ostensible authorization found in the word "assigns," appearing in the usual bill of lading, and in the one at bar, which is neither found nor implied in a mere change or delivery of possession of the articles of which bills of lading are the symbols. The same may be said of a bill of lading which has been indorsed in blank; as, by analogy to other commercial instruments of a negotiable character, such an indorsement apparently authorizes the holder to fill up the blank at his option. The application of the rules of estoppel to bills of lading like this at bar, appearing on their faces to be transferable in the light of the views and expressions which we have cited, would seem to be in harmony with legal principles. Nevertheless, the state of the authorities on this topic is not satisfactory. It must be admitted that the ordinary deposit of title papers does not enable the person holding them to make a title to personal property beyond what he himself possesses. The cases on this point are numerous. A marked one is Johnson v. Credit Lyonnais Co. (decided in 1877) 3 C. P. Div. 32, which touched the negotiability of certain dock warrants. Chief Justice Cockburn delivered the opinion, and said (page 40) that, at common law, the leaving in the vendor the possession of goods bought, or of the documents of title, would not estop the vendee in case of a fraudulent sale or pledge by the party with whom the goods or documents were left. It is evident, however, that, as the chief justice concurred in Rumball v. Bank, 2 Q. B. Div. 194, he had in view only the ordinary principle touching such matters, which may be distinguished from cases involving bills of lading negotiable in form.

Numerous cases may be found where it has been held that a factor who holds a bill of lading for sale cannot pledge; but in such cases either it appeared that there were grounds for charging the pledgee with knowledge of the factorship, or the decisions were made before the modern development of the doctrine of estoppel, or without giving it full consideration. The later English text-books, while laying down in general terms the proposition that a bill of lading is not negotiable in the full sense in which promissory notes are, do not seem to have come to the precise question upon which we must pass. Carv. Carr. by Sea (2d Ed.; published in 1892) p. 490, lays down the ordinary rule that possession of the bill of lading is only equivalent to that of the goods themselves; but the precise proposition in question here is not considered. The same may be said as to Benj. Sales (6th Ed.; published in 1892) p. 845. Scrutt. Charter Parties (3d Ed.; published in 1893) is no more definite; although on page 157 the author says that "the lawful holder of a bill of lading, in whom the property in the goods is vested, may, by indorsement, transfer a right greater than he himself has, for he transfers his position under the contract evidenced in the bill of lading." Bank v. Henderson, L. R. 5 P. C. 501, is directly in point in favor of Reardon, if the transaction did in fact raise a trust attaching to the bill of lading, as the court assumed it did. Sir Barnes Peacock cites with apparent approval (page 512) from the judgment in Rodger v. The Comptoir d'Escompte de Paris, L. R. 2 P. C. 393, the following:

"The general rule, so clearly stated and explained by Lord St. Leonards, is that the assignee of any security stands in the same position as the assignor as to the equities arising upon it. This, as a general rule, was not disputed; but it was contended that the case of a bill of lading is exceptional, and must be dealt with on special grounds. Doubtless the holder of an indorsed bill of lading may, in the course of commercial dealing, transfer a greater right than he himself has. The exception is founded on the negotiable quality of the document. It is confined to the case where the person who transfers the right is himself in actual and authorized possession of the document, and the transferee gives value on the faith of it, without having notice of any circumstance which would render the transaction neither fair nor honest."

None of the decisions of the supreme court is in point. In some of them the rule is recognized—so frequently stated—that a factor who holds a bill of lading for sale cannot pledge, but we do not find that that court has ever said that advances made to a factor holding a clean bill of lading by one not chargeable with knowledge of the factorship will not be protected. In Conard v. Insurance Co., 1 Pet. 385, the following appears on page 445:

"By the well-settled principles of commercial law the consignee is thus constituted the authorized agent of the owner, whoever he may be, to receive the goods; and by his indorsements of the bill of lading to a bona fide purchaser for a valuable consideration, without notice of any adverse interest, the latter becomes, as against the world, the owner of the goods. This is the result of the principle that bills of lading are transferable by indorsement, and thus may pass the property. It matters not whether the consignee in such case be the buyer of the goods or the factor or agent of the owner. His transfer, in such a case, is equally capable of divesting the property of the owner and vesting it in the indorsee of the bill of lading. And, strictly speak-

ing, no person but such consignee can, by an indorsement of the bill of lading, pass the legal title to the goods."

It is true that these expressions were not strictly in point. Nevertheless, they must be accepted as the unreserved opinion of the great jurist, Judge Story, who uttered them.

It may be claimed that the various factors acts, now law in several states and in England, constitute, by implication, legislative declarations that the holder of a bill of lading cannot vest a title better than his own. But these acts relate to a multitude of matters. It must be admitted that legislation was desirable to remove doubts, and settle the law touching questions of the class under discussion; and many statutes, modern as well as ancient, have, after all, been found to be only declaratory of the common law. The transactions in issue in this case related to merchandise on the coast of Africa, about to be shipped on the high seas, and were between residents of Massachusetts and residents of New York. They were, therefore, not directly controlled by legislation all of which is local, nor can this court be of necessity indirectly governed by any implications arising therefrom.

On the whole, the legal principles applicable seem clear, and, if the case involves any obscurity, we think it is because those principles have not been freely stated or applied. In the developments of commerce and commercial credits the bill of lading has come to represent the property, but with greater facility of negotiation, transfer, and delivery than the property itself. It is a negotiable instrument, even though not in the same sense as promissory notes or bills of exchange. It carries on its face, in the words "and assigns," an authority to dispose of it, and, as we have seen, a like authority when indorsed in blank, by which the person who voluntarily puts it out, or permits it to be put out, ought to be estopped. And it has become so universal and necessary a factor in mercantile credits that the law should make good what the bill of lading thus holds out. There is every reason found in the law of equitable estoppel and in sound public policy for holding, and no injustice is involved in holding, that, if one of two must suffer, it should be he who voluntarily puts out of his hands an assignable bill of lading, rather than he who innocently advances value thereon.

When Pollard, Pettus & Co. accepted from Mansfield a bill of sale of the hides in question, they knew that in the regular course of business a clean bill of lading for them would issue to him, clothing him with the customary indicia of absolute ownership. They took the chances arising from this. They must stand as though they assented to it, and they can claim no right against any one who dealt with Mansfield in good faith relying upon it. Their presumed assent to the issue of the bill of lading to Mansfield is emphasized by their laches in applying for it. Whatever may be the nature of their right, it cannot prevail against Reardon's title under the bill of lading.

The law of stoppage in transitu admits the right of the purchaser of the cargo to stop it at any intermediate point, and transfer it by an actual delivery of it. Where the delivery is of the bill of

lading, the point settled is that it is of the same effect as an actual delivery of the cargo. Therefore cases touching stoppage in transitu are considered to relate rather to the question of the effect of the negotiation of the bill of lading than to that of the apparent authority of the person holding it.

There is no question touching Reardon's bona fides. That his advances constituted a present consideration for value is sustained by Leask v. Scott, 2 Q. B. Div. 376. This case seems to be now regarded in England as settled law. When Reardon first made his advances he did it with a stipulation that the bill of lading should be delivered to him as soon as it arrived. Consequently the delivery of it to him on arrival, in connection with the prior stipulation, constituted in equity but one transaction. Moreover, while Mansfield was still apparently solvent, Reardon renewed his advances on the strength of it.

A question of jurisdiction has been suggested. It is, we think, without force. At the time the complainants below demanded the goods from the collector they had not in fact been delivered from his custody. Therefore, under the provisions of section 934 of the Revised Statutes, they were irrepleviable, although subject to the orders and decrees of the courts of the United States having appropriate jurisdiction. There was no form of action at common law which would give complainants possession of them. A bill in equity was the only, and therefore an appropriate, method of proceeding therefor.

The bill in this case does not pray relief by the way of redeeming from Reardon, but merely demands possession of the goods, on the ground that the claim of Pollard, Pettus & Co., the complainants below, is prior to that of Reardon. Inasmuch as we find that Reardon has a prior claim, and a prior right of possession, no relief can be granted under this bill. Since it was filed, a stipulation was entered into between the parties in interest, by virtue of which the goods were delivered to Reardon without prejudice to the controversy involved in this suit. Therefore no further relief is asked for against the collector, and, on our conclusions, the complainants below were never entitled to any relief against him. By reason of the stipulation the collector had no occasion to take any share in this appeal, nor has he done so. He is therefore not entitled to any costs in this court. He, however, made a several defense in the circuit court, and properly did so.

The decree of the circuit court is reversed, and the case remanded to that court, with directions to enter a decree dismissing the bill, with full several costs in that court for Saltonstall, and with full several costs in this court and in that court for Reardon.